# EXHIBIT D

REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF MOTION OF DEFENDANTS WARRIOR
TRADING, INC. AND ROSS CAMERON FOR JUDGMENT ON THE PLEADINGS; OR, IN THE
ALTERNATIVE, TO STAY THE PRESENT CASE



**AMERICAN ARBITRATION ASSOCIATION®**    INTERNATIONAL CENTRE FOR DISPUTE RESOLUTION®

**COMMERCIAL ARBITRATION RULES**
**DEMAND FOR ARBITRATION**

*For Consumer or Employment cases, please visit **www.adr.org** for appropriate forms.*

| You are hereby notified that a copy of our arbitration agreement and this demand are being filed with the American Arbitration Association with a request that it commence administration of the arbitration. The AAA will provide notice of your opportunity to file an answering statement. |
|---|

| Name of Respondent:  Jeffrey Fortis |
|---|

| Address:  69 Olive Way |
|---|

| City:  Woodland | State:  California | Zip Code:  95695 |
|---|---|---|
| Phone No.: | Fax No.: | |

| Email Address:  jpfortis@gmail.com; jeff@fortis.me |
|---|

| Name of Representative (if known):  Susan Hannigan |
|---|

| Name of Firm (if applicable):  Richards Layton & Finger |
|---|

| Representative's Address:  One Rodney Square, 920 North King Street |
|---|

| City:  Wilmington | State:  Delaware | Zip Code:  19801 |
|---|---|---|
| Phone No.: | Fax No.: | |

| Email Address:  Hannigan@RLF.com |
|---|

| The named claimant, a party to an arbitration agreement which provides for arbitration under the Commercial Arbitration Rules of the American Arbitration Association, hereby demands arbitration. |
|---|

| Brief Description of the Dispute:<br><br>Shareholder dispute and tortious conduct.  Please see attached Demand for Arbitration. |
|---|

| Dollar Amount of Claim: $  in excess of $50,000 |
|---|

| Other Relief Sought: ☑ Attorneys Fees  ☑ Interest  ☐ Arbitration Costs  ☑ Punitive/Exemplary<br>☑ Other:  Declaratory judgment, etc. |
|---|

| Amount enclosed: $  3,500.00<br>In accordance with Fee Schedule: ☐ Flexible Fee Schedule  ☑ Standard Fee Schedule |
|---|

| Please describe the qualifications you seek for arbitrator(s) to be appointed to hear this dispute:<br><br>An arbitrator experienced in corporate law and employment law as well as experience in handling shareholder disputes for closely held corporations. |
|---|

| Hearing locale:  Delaware<br>*(check one)* ☑ Requested by Claimant ☐ Locale provision included in the contract |
|---|

| Estimated time needed for hearings overall: | hours  or  5 | days |
|---|---|---|

*Please visit our website at www.adr.org if you would like to file this case online.*
*AAA Case Filing Services can be reached at 877-495-4185.*



**AMERICAN ARBITRATION ASSOCIATION®**   INTERNATIONAL CENTRE FOR DISPUTE RESOLUTION®

**COMMERCIAL ARBITRATION RULES
DEMAND FOR ARBITRATION**

| | |
|---|---|
| Type of Business: | |
| Claimant: Warrior Trading, Inc. | Respondent: Jeffrey Fortis |
| Are any parties to this arbitration, or their controlling shareholder or parent company, from different countries than each other?<br>No | |
| Signature (may be signed by a representative): | Date:<br>February 1, 2019 |
| Name of Claimant: Warrior Trading, Inc. | |
| Address (to be used in connection with this case): P.O. Box 522 | |
| City: West Stockbridge | State: Massachusetts    Zip Code: 01266 |
| Phone No.: | Fax No.: |
| Email Address: rcameron@warriortrading.com | |
| Name of Representative: Leigh Goddard, Laura Jacobsen | |
| Name of Firm (if applicable): McDonald Carano LLP | |
| Representative's Address: 100 W. Liberty Street, Tenth Floor | |
| City: Reno | State: Nevada    Zip Code: 89501 |
| Phone No.: (775) 788-2000 | Fax No.: (775) 788-2020 |
| Email Address: lgoddard@mcdonaldcarano.com; ljacobsen@mcdonaldcarano.com | |

To begin proceedings, please send a copy of this Demand and the Arbitration Agreement, along with the filing fee as provided for in the Rules, to: American Arbitration Association, Case Filing Services, 1101 Laurel Oak Road, Suite 100 Voorhees, NJ 08043. At the same time, send the original Demand to the Respondent.

*Please visit our website at www.adr.org if you would like to file this case online.*
*AAA Case Filing Services can be reached at 877-495-4185.*

WARRIOR TRADING, INC., a
Delaware corporation,

               Plaintiff,

v.

JEFFREY FORTIS, an individual and
as Trustee of the Jeffrey Fortis Family
Trust,

               Defendant.

## DEMAND FOR ARBITRATION

Plaintiff Warrior Trading, Inc., a Delaware corporation ("Warrior Trading") alleges and demands arbitration against Defendant Jeffrey Fortis ("Fortis") as follows:

## INTRODUCTION

## PARTIES, JURISDICTION, AND VENUE

1.     Warrior Trading is a Delaware corporation. Warrior Trading was formerly known as Newfane Design, Inc., a Vermont corporation, but domesticated in Delaware as Warrior Trading, Inc. in October 2017. Warrior Trading maintains offices in California and Massachusetts.

2.     Fortis is a resident of the State of California.  Fortis is also the trustee of the Jeffrey Fortis Family Trust ("Fortis Trust").

3.     Ross Cameron ("Cameron") is the founder, president, and Chief Executive Officer of Warrior Trading, a full-time day trader, and the head trading mentor for Warrior Trading. Cameron is also the majority shareholder, currently owning 1,001 of the total 1,540 shares of capital stock of Warrior Trading.

4.     Fortis is the former Chief Operating Officer, a former employee, and a former shareholder of Warrior Trading. Prior to his termination, Fortis was also one of Warrior Trading's trading mentors for students. Fortis or the Fortis Trust owned 462 shares at the time Fortis was terminated for cause and forfeited any and

all shareholder rights.

5.   Alex Fortis is Fortis's brother, an employee of Warrior Trading, and owner of 77 shares of Warrior Trading capital stock.

6.   Warrior Trading, Cameron, Fortis, and Fortis's brother, Alex Fortis, are each a signatory to a Shareholder Agreement, dated August 18, 2016, as amended by that certain Amendment No. 1 to Shareholder Agreement, dated December 15, 2017. The Shareholder Agreement and Amendment No. 1 are referred to herein as the "Shareholder Agreement". A true and correct copy of the Shareholder Agreement is attached hereto as **Exhibit 1**.

7.   The Shareholder Agreement provides that Delaware law shall govern the terms of the Shareholder Agreement and any controversy or claim arising out of or relating to the Shareholder Agreement, or breach thereof, shall be settled by binding arbitration in Delaware or such other agreed location. Shareholder Agreement § 14(g).

## GENERAL ALLEGATIONS

8.   At all times alleged herein, Warrior Trading was and is engaged in the business of providing market trading education to its customers and students.

9.   Warrior Trading's success heavily relies on positive reviews and feedback from its current and former students regarding Warrior Trading's high-quality services.

10.   Warrior Trading's valuable brand and reputation are dependent, in large part, on the conduct of Warrior Trading's employees that provide trading education to its students.

### A.   Fortis's Employment With Warrior Trading

11.   Fortis became employed by Warrior Trading on or about March 22, 2016. Prior to becoming an employee of Warrior Trading, Fortis worked as a consultant in 2014 and 2015. During his employment Fortis worked as a trading

mentor to Warrior Trading's students/customers.

12.     Warrior Trading observed numerous deficiencies in Fortis's performance in 2016 and 2017.  Specifically, in the Fall of 2017, Warrior Trading hosted an Inner Circle Seminar in New York City, New York.  The Inner Circle Seminars are a source of marketing for Warrior Trading, resulting in significant future engagement with participants as customers of Warrior Trading products and services.  As a member of the Warrior Trading executive team, Fortis was required to be present and participate in the Seminar.  Fortis failed to attend a majority of the events.  He did not appear at morning preparation sessions and stayed out late at restaurants and clubs.

13.     Following the New York Inner Circle event, Warrior Trading discovered that Fortis made more than $12,000 of unauthorized charges on his company American Express card for visits to New York night clubs.

14.     In November 2017, Cameron met with Fortis to discuss his poor performance and unauthorized charges to the company credit card.  Warrior Trading required Fortis to reimburse the company for the unauthorized charges, and Fortis agreed to do so.  Going forward, Fortis acknowledged that he would not make charges of a similar nature on company credit card without prior approval.

15.     In January 2018, a Warrior Trading board member requested that Fortis prepare and present a complete business model and business case for certain online chat room services.  This work was never completed as directed.

16.     Fortis also had been assigned to work with customers on technical and refund requests.  Warrior Trading discovered that Fortis was disrespectful and unprofessional with its customers resulting in a significant spike in refund requests.  As a result, Fortis's job responsibilities in this regard had to be assigned to another employee.

17.     The Board of Directors also observed that Fortis was often not present

either physically in the California office or on the online chat room, which was part of his duties and responsibilities.

18. In early 2018, Cameron again met with Fortis to address his performance and commitment to improving his work performance. Fortis, although defensive during the meeting, indicated that he would provide his full-time commitment toward his Warrior Trading job responsibilities.

19. Despite Fortis's representation that he would commit to his full-time employment with Warrior Trading, he proceeded to take personal leave for 40 days in the first two quarters of 2018, and without formally requesting personal time off ("PTO") as required under the company policy that he crafted.

20. On January 12, 2018, Fortis failed to appear for an all hands company meeting. As a result, two board members spoke to Fortis about his failure to appear and to stress, once again, the importance of appearing for company meetings.

21. On February 8 and 9, 2018, Fortis once again failed to appear for business modeling meetings with the Warrior Trading executive team.

22. On February 25, 2018, Fortis once again made unauthorized night club charges on the company American Express card, in excess of $4,000.

23. Once again, on March 6, 2018, Fortis missed an all hands company meeting. Just a week later, March 13 through March 16, 2018, one of Warrior Trading's vendors hosted an event in Salt Lake City. Fortis made numerous charges to the company credit card at venues in Salt Lake City, and yet he did not actually appear at the vendor event.

24. Also, in March 2018, Fortis made unauthorized charges and used company American Express points to acquire airline tickets for his girlfriend and others.

25. On April 27, 2018, Fortis made another unauthorized charge on the

company American Express credit card by making a $5,200 donation to Allegiant Giving Corporation.

26.   Fortis was absent most of May 2018 while traveling to Hawaii and Europe, again without requesting or receiving authorization for PTO.

27.   On July 6, 2018, Fortis again missed an all hands company meeting, and the following week he missed several work days while traveling to Lake Tahoe, Nevada, once again without requesting or obtaining authorization for PTO.

28.   In August 2018, Fortis transferred more than 1,759,000 American Express points to his personal Delta Account. While 836,500 of the points were used for the purchase of team member flights for an Inner Circle Seminar in Orlando, Florida, the remaining 922,500 points were not accounted for and never returned to Warrior Trading.

29.   In August, Warrior Trading discovered that Fortis made unapproved plane ticket purchases for himself, his girlfriend, and his friends on more than 10 different occasions.

30.   Without prior notice or approval from the CEO or the Board, Fortis hired an assistant with an annual salary of more than $50,000 per year. Cameron, whose office is in Massachusetts, only discovered that the new employee was hired when the employee's payroll information was being processed.

31.   In September 2018, Warrior Trading hosted an Inner Circle Seminar in Orlando, Florida at which Fortis was identified as one of the keynote speakers. His seminar materials and slides for his speech were supposed to be completed and provided to the marketing team for review. Fortis failed to meet any of the deadlines, resulting in him being removed from a webinar although Fortis remained on the agenda for one talk. Even then, his slides were hastily prepared and his performance during the speech was unsatisfactory. The live webinar hosted during the Inner Circle Seminar had the lowest customer conversion rate of

any Warrior Trading Webinar.

32.   Finally, in September 2018, it became clear that Fortis was no longer performing duties required of Warrior Trading's chief operating officer. While a performance improvement plan for Fortis had previously been drafted, the Board of Directors determine that Fortis could not be trusted to carry out any of its required tasks.   The Board was considering demoting Fortis to Business Development Coordinator or taking other actions when more immediate misconduct became apparent later in the month.

33.   Specifically, on September 10, 2018, Warrior Trading learned that while Fortis and other Warrior Trading team members were in New York for the Inner Circle event in the Fall of 2017, Fortis offered another employee cocaine. The employee observed a bag of white powder that Fortis showed to him.

34.   Then, on September 19, 2018, Cameron communicated privately with Fortis to inquire about a report that Fortis had a firearm in his office, which violates the company policies against weapons in the workplace. Three days later, Fortis finally responded to Cameron's request for information via email, with numerous other employees, including lower-level employees, copied to what had been a private conversation. In this rambling email, Fortis demanded to know the identity of the party reporting the weapons violation.

35.   On September 24, 2018, Fortis, intentionally or recklessly and without authorization or beyond his authorization, accessed and deleted more than 2,000 Warrior Trading documents stored on Fortis's company Google drive.

36.   On September 27, October 7, and October 9, 2018, Fortis used company American Express points to make unauthorized purchases at Amazon.com.

37.   Fortis failed to appear for work on October 8 and 9, 2018, and on October 10, Fortis did not log into the online chat room until very late in the day

and was not active.

**B.    Termination and Post-Termination Conduct**

38.    After consultation with the Board, Cameron scheduled a meeting with Fortis for October 12, 2018.  The purpose of the meeting was to address Fortis's numerous performance deficiencies and extensive violations of company policies.

39.    Fortis failed to appear for the October 12, 2018 meeting.  As a result, Cameron gave Fortis notice of the termination for cause via email.

40.    The following day, on October 13, 2018, Fortis successfully transferred 450,000 of company American Express points to his airline account with Emirates Airline.   Suspecting fraud, American Express reversed the transaction. Fortis also attempted to transfer company American Express points to his airline accounts with Hawaiian Airlines and British Airlines, but American Express blocked these attempts.  However, Fortis was able to successfully transfer 66,000 American Express points to his Delta Airlines account, and this transaction could not be reversed.

41.    Fortis also deleted Cameron's access to his account on Slack, a software system used by all Warrior Trading employees for internal communications.   Fortis also interfered with company access to software applications Mailchimp (marketing provider) and Trumpia (mobile and text-message marketing provider).

42.    On October 15, 2018, Fortis took action with ADT, the provider of Warrior Trading's security system, to lock the company out of its ADT account by resetting the default email account.

43.    On October 16, 2018, Fortis downloaded Warrior Trading's customer contact list from Mailchimp while he was still in control of the account.

44.    On October 16, 2018, Warrior Trading sent a letter to Fortis providing some of the reasons for Fortis's termination for cause including, without limitation:

(1) failing to report to work on a regular basis without prior notice; (2) failing to attend several important meetings; (3) using Warrior Trading credit cards for personal use; (4) transferring Warrior Trading credit card points to Fortis's personal account; (5) possessing a firearm in the workplace; and (6) offering cocaine to a Warrior Trading employee at a work function. A true and correct copy of the October 16, 2018 termination letter is attached hereto as **Exhibit 2**.

45. Warrior Trading demanded that Fortis return his Apple laptop, keys, key cards and any other company property, including the American Express points that Fortis transferred without authorization.

46. Fortis fails and refuses to return all Warrior Trading property within his possession and control, including without limitation, the Warrior Trading company credit card points, an Apple laptop, keys, and key cards.

C. **Shareholder and Employment Agreements**

47. In early 2016, Cameron, Fortis and Alex Fortis entered into discussions for Fortis and Alex Fortis to become employees and shareholders of Warrior Trading.

48. Drafts of the Shareholder Agreement were circulated by and amongst the shareholders along with proposed forms for the employment agreement and independent contractor agreement.

49. The final Shareholder Agreement, Employment Agreement and Independent Contractor Agreement were distributed to the shareholders for signature.

50. The Shareholder Agreement was executed by the shareholders on August 16, 2016.

51. Warrior Trading is informed and believes that Fortis executed the Employment Agreement on or around March 22, 2016 when the company requested all employees to sign them and when Alex Fortis signed his Employment

Agreement. However, since Fortis's termination, Warrior Trading has been unable to locate an executed copy of his Employment Agreement and is informed and believes that Fortis may have destroyed or otherwise misplaced his Employment Agreement.

52.     The Employment Agreement identifies and defines Warrior Trading's "Confidential Information", which includes, without limitation, business plans, projects in which the company has rights or are under consideration by the company, names of company employees, and customer lists.   (Employment Agreement at ¶ 5(a).)    Further, the Agreement provides that Confidential Information shall remain confidential and not be disclosed to anyone during or after the termination of employment.  Moreover, the Agreement provides that after termination of employment, the employee shall not take or use any Confidential Information, records or files of the Company, and will return to the Company all such records and files that Fortis may have in his control or possession. (*Id.*)

53.     Under the terms of the Employment Agreement, Fortis agreed to not disclose, circulate, publish or otherwise disseminate any information regarding his engagement under the Employment Agreement without first obtaining prior written approval of the Company or otherwise required by law.

54.     The Employment Agreement further provides that it can be terminated under various conditions, including termination for "Cause":

> By COMPANY for Cause.  COMPANY may terminate, without liability, the Period of Employment for Cause (as defined below) at any time effective immediately upon written notice to Employee. . . . Termination shall be for Cause if: (i) because of any act or failure to act by Employee which, in the sole opinion of the Board, is in bad faith and to the detriment of COMPANY; (ii) in the sole opinion of the Board, Employee refuses or fails to act in accordance with any direction or order of the Board related to Employee's employment or duties under this Agreement; (iii) Employee exhibits, in the sole opinion of the Board, unfitness or unavailability for service (other than disability, as provided for in Paragraph 6(a)), unsatisfactory performance, dishonesty, habitual neglect, or incompetence in the conduct of the affairs of COMPANY; (iv) Employee is convicted of or pleads guilty or no contest to a crime; or (v) because Employee, in the

reasonable opinion of the Board, has breached any material term of this Agreement.

(*Id.* at ¶ 6(b).)

55.   The Warrior Trading Employee Handbook ("Handbook") in effect during Fortis's employment provided various policies and procedures applicable to company employees.

56.   The Handbook provides for discipline, up to including immediate discharge, for impermissible conduct, including:

- Refusing to accept appropriate work assignments or refusing to perform tasks assigned by a supervisor in the appropriate manner.

- Refusing to follow [a] manager's work instructions or directions, or engaging in insubordination.

- Conducting personal business, including outside employment, on working time or with company equipment, supplies, materials, or products, without management approval.

- Possessing or using weapons . . . in the workplace.

- . . . failing to return any property (physical or intellectual) belonging to the company . . . .

- Violence, threats of violence or intimidation, bullying or coercing any worksite employee, contractor, customer, or vendor of or visitor to your company. . .

- Violation of any company rule, practice, or policy, including any policy in this handbook.

- Unsatisfactory performance of job duties.

(Handbook at pp. 11-12.)

57.   The Handbook also further defines Confidential Information to include confidential and proprietary information regarding the company, including

its vendors, its customers, business plans, strategies, budgets, projections, forecasts, financial and operating information, business contracts, databases, financial and account information, HIPAA protected medical information, customer and vendor information, advertising and marketing plans, proposals, training materials and methods, and other information not available to the public. Disclosure of Confidential Information will result in disciplinary action, up to and including termination of employment. (*Id.* at p. 17.)

58.    The Handbook also provides that Warrior Trading is committed to a violence-free workplace for employees. Under this policy, if employees become aware of any workplace security hazards, they are encouraged to report any and all concerns without fear of retaliation of any kind. The policy also provides that employees may make such reports anonymously. (*Id.* at p. 33.)

59.    Finally, the Handbook also provides a policy for a Drug-Free Workplace. The policy prohibits the use, possession, sale, or solicitation of illegal drugs while on duty, on company premises, or company time.

**D.    Notice of Buy-Back**

60.    The Shareholder Agreement provides for the purchase of shares if a shareholder's employment is terminated for Cause. It provides:

> In the event any employee Shareholder is no longer employed by the Company because of voluntary termination, or termination by the Company for Cause (the term "Cause" as defined in the then applicable employment agreement between Company and the relevant employee Shareholder, except that irrespective of such definition, it shall not include physical and/or mental disability), the Company and the remaining Shareholders shall have the option for 90 days following notice of any such event(s) to purchase all or any part of the shares owned by the terminated employee Shareholder. . . .

> Notwithstanding anything to the contrary in this Agreement or applicable laws, and to the fullest extent permissible under the law, an employee Shareholder whose employment terminates because of termination by the Company for cause at any time, shall forfeit any and all shareholder rights immediately upon termination of employment.

61.    On October 16, 2018, Warrior Trading issued a Notice of Buy-Back pursuant to Section 9(e) and 14(e) of the Shareholder Agreement ("Notice of Buy-Back") to Fortis. The Notice of Buy-Back is attached hereto as **Exhibit 3**.

62.    The Notice of Buy-Back triggered a 90-day option period for Warrior Trading and/or the remaining shareholders (Cameron or Alex Fortis) to purchase all or any part of Fortis's shares of capital stock in Warrior Trading.

63.    Though he was immediately stripped of shareholder rights, Fortis, through the Fortis Trust, holds 462 shares of capital stock of Warrior Trading that are currently subject to the optional buy back.

64.    Warrior Trading had an exclusive right to purchase all or any part of Fortis's 462 shares for the first 45 days after the Notice of Buy-Back. (*See* Shareholder Agreement § 9(a), (e).)  Warrior Trading did not exercise its option during this period and did not purchase any of Fortis's shares.

65.    The remaining shareholders of Warrior Trading, including Cameron, have a 45-day period after expiration of the first 45-day period, up to and including January 10, 2019, to purchase all or any part of Fortis's 462 shares.

66.    The Shareholder Agreement establishes that the purchase price for shares subject to the Shareholder Agreement "shall be determined by dividing the net income of the Company for the Company's prior fiscal year by the number of outstanding shares issues [sic] to Shareholders." (Shareholder Agreement § 10.)

67.    Warrior Trading's fiscal year runs annually from January 1 to December 31.

68.    On November 6, 2018, Fortis, through a letter from his legal counsel, disputed that he was terminated for cause by Warrior Trading. Fortis argued that Warrior Trading did not properly invoke Section 9(e) of the Shareholder Agreement, which permits Warrior Trading to terminate an employee for cause.

69.    Specifically, Fortis's counsel contends that there is no employment

agreement between the Warrior Trading and Fortis. As noted above, Warrior Trading is informed and believes that Fortis executed the Employment Agreement and has subsequently destroyed or misplaced the Employment Agreement.

70. Even if the Employment Agreement has not been executed, there existed an implied-in-fact agreement for employment between Warrior Trading and Fortis, for which Fortis provided services in exchange for compensation and other benefits.

71. During the term of his employment, Fortis violated numerous and extensive company policies. As a result, Fortis has been terminated for cause.

E.   **Continuing Acts of Sabotage and Theft of Company Property**

72. On or about December 24, 2018, Warrior Trading learned of additional intentional and malicious actions Fortis has taken with the intent to harm Warrior Trading.

73. Upon information and belief, Fortis published or caused to be published a threatening video regarding Warrior Trading and Cameron, which was published on YouTube and emailed to certain current Warrior Trading employees and potentially others (the email recipients were blind-copied).

74. Upon information and belief, Fortis accessed his prior company email account without authorized and changed the login credentials thereto. He then deleted all of the emails in his prior company email account without authorization.

75. Upon information and belief, Fortis changed the login credentials to Warrior Trading social media and insurance accounts without authorization, including Instagram and Hartford Insurance.

76. On December 23, 2018, Fortis accessed confidential Warrior Trading electronic company documents without authorization and deleted hundreds of Warrior Trading electronic files.

77. Also, on December 23, 2018, Fortis accessed Warrior Trading's

account with vendor Expensify, software used to manage credit card purchased by office staff.

78.   On December 24, 2018, Fortis accessed the Warrior Trading electronic files and downloaded *thousands* of files including confidential customer information, customer credit card and personal information, and other customer data.

79.   Also, on that same day, Fortis accessed the Warrior Trading system and deleted hundreds of electronic files.

80.   On December 24, 2018, an email was sent to Warrior Trading employees from an anonymous sender identified as "450+ cooperating victims." The email states that "we . . . dropped a YouTube video about Ross Cameron and his supporters. . . ." The video link is contained in an email. The YouTube video accessed via the link in the email contains a threatening message in the style of "Anonymous," a well-known producer of other videos.

81.   Another email was sent on December 26 containing another link to another threatening YouTube video.

82.   Another threatening video was posted on YouTube on December 31, 2018.

83.   Warrior Trading is informed and believes Fortis is responsible for the access and destruction of company files, interference with its business accounts, and threatening emails and videos.

## FIRST CLAIM FOR RELIEF

### (Declaratory Judgment)

84.   Warrior Trading repeats and realleges each and every allegation contained in the preceding paragraphs as though set forth fully herein.

85.   Pursuant to the Delaware Declaratory Judgment Act, this dispute is ripe for determination of the parties' respective rights, status, and other legal

relations. 10 *Del. C.* § 6501 et seq.

86.    The Shareholder Agreement constitutes a valid and binding contract between Fortis, Cameron, Alex Fortis, and Warrior Trading.

87.    A judiciable controversy has arisen and now exists between Fortis and Warrior Trading concerning their respective rights and obligations under the Shareholder Agreement.

88.    Warrior Trading is entitled to a declaration that it has performed all obligations required of it and has otherwise fully complied with the Shareholder Agreement.

89.    Warrior Trading is entitled to a declaration that Fortis's employment was terminated for cause.

90.    Warrior Trading is entitled to a declaration that it had the right and power to terminate Fortis's employment for cause and properly invoked such right.

91.    Warrior Trading is entitled to a declaration that it properly invoked Section 9(e) of the Shareholder Agreement, that it properly provided Fortis the "Notice of Buy-Back" in accordance with the Shareholder Agreement, and that Fortis and/or the Fortis Trust's rights as a shareholder terminated effective as of October 12, 2018, in accordance with Section 9(e) of the Shareholder Agreement.

92.    Warrior Trading is entitled to a declaration that if a shareholder exercises an option to purchase all or any of Fortis's shares on or after January 1, 2019 and on or before January 10, 2019, the purchase price of those shares shall be determined by dividing the net income of Warrior Trading during the fiscal year running from January 1 through December 31, 2018 by the number of outstanding shares issued to the Fortis Trust.  The Fortis Trust owned 462 shares at the time Fortis was terminated for cause and forfeited any and all shareholder rights.

93.    Warrior Trading is entitled to a declaration that when Fortis's employment was terminated for cause on October 12, 2018, Fortis forfeited any

and all shareholder rights immediately, including without limitation, any rights to any and all dividends or distributions thereafter.

94.     Warrior Trading is entitled to a declaration that Fortis engaged in misconduct prohibited under the Agreement by, including without limitation, locking Warrior Trading out of certain company accounts, refusing to return company property within his possession and control, accessing and changing the login credentials to Warrior Trading company email accounts, deleting company emails, and accessing, downloading, and/or deleting confidential company documents, which conduct also allows for the optional purchase of all or any of Fortis's shares pursuant to the terms of Section 9(b) of the Shareholder Agreement.

## SECOND CLAIM FOR RELIEF

### (Tortious Interference with Contractual Relations)

95.     Warrior Trading repeats and realleges each and every allegation contained in the preceding paragraphs as though set forth fully herein.

96.     Warrior Trading and third parties have existing contractual relations, including without limitation, current Warrior Trading employees, students, customers, and third-party vendors.

97.     As a former shareholder and employee, Fortis knew of these existing contractual relationships.

98.     As more fully described herein above, including by locking Warrior Trading out of certain company accounts, emailing current employees a threatening video, deleting company emails, and accessing, downloading, and/or deleting confidential company documents and customer information, Fortis has engaged in intentional acts intended to disrupt Warrior Trading's contractual relationships.

99.     These acts constitute a violation of Fortis's duties to Warrior Trading as a former shareholder, officer, and employee, his Employment Agreement, and

the Shareholder Agreement.

100.   Upon information and belief, there has been actual disruption of these contractual relationships.

101.   As a direct and proximate result of Fortis's intentional and malicious actions, Warrior Trading has sustained damages in excess of $50,000, the total amount to be proved at arbitration.

102.   As a direct and proximate result of Fortis's intentional and malicious actions, Warrior Trading is entitled to an award of punitive and exemplary damages, costs, and attorneys' fees.

## THIRD CLAIM FOR RELIEF

### (Violations of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030(g))

103.   Warrior Trading repeats and realleges each and every allegation contained in the preceding paragraphs as though set forth fully herein.

104.   During his employment and while he was a shareholder, Fortis knowingly and intentionally accessed Warrior Trading's email account, social media accounts, electronic calendars, electronic systems, and document storage systems and deleted documents in excess of his authorization in violation of 18 U.S.C. § 1030(a)(2)(C) and (a)(5)(C) and in violation of his duties, his Employment Agreement, and the Shareholder Agreement.

105.   After he had been terminated from employment and stripped of his shareholder rights, Fortis knowingly and intentionally accessed Warrior Trading's email account, social media accounts, electronic calendars, electronic systems, and document storage systems without authorization in violation of 18 U.S.C. § 1030(a)(2)(C) and (a)(5)(C) and in violation of his duties, his Employment Agreement, and the Shareholder Agreement.

106.   Warrior Trading's email accounts, social media accounts, calendars, electronic systems, and document storage systems are each used in and affecting

interstate or foreign commerce and therefore constitute a "protected computer" under the Computer Fraud and Abuse Act. 18 U.S.C. § 1030(e)(2)(B).

107.   By accessing these accounts and systems deleting confidential and proprietary documents, Fortis intentionally accessed Warrior Trading's protected computers beyond his authorization while he was an employee and a shareholder and without authorization following his termination and forfeiture of his shareholder rights pursuant to the Shareholder Agreement.

108.   In response to learning of Fortis's unauthorized access, Warrior Trading has been compelled to conduct an investigation using internal and external resources to discover the full extent of the unauthorized access and remedy the damage wrecked by Fortis.   Warrior Trading has devoted significant resources, including the cost of investigation and remediation, outside counsel fees, and the time and attention of senior executives and information technology staff to mitigating the damage caused by Fortis's unauthorized access to Warrior Trading's systems.

109.   As a direct and proximate result of Fortis's unauthorized access and abuse of Warrior Trading's accounts, Warrior Trading has suffered a loss in excess of $5,000, the total amount to be proved at arbitration.

<u>**FOURTH CLAIM FOR RELIEF**</u>

**(Violations of the Defend Trade Secrets Act,
18 U.S.C. § 1836, et seq.)**

110.   Warrior Trading repeats and realleges each and every allegation contained in the preceding paragraphs as though set forth fully herein.

111.   The information removed from Warrior Trading by Fortis is confidential and proprietary and includes information which derives independent economic value from not being known or ascertainable by the public at large, which is not readily discoverable by competitors, and which is the subject of

reasonable efforts on the part of Warrior Trading to maintain its secrecy.

112.   The proprietary and confidential information acquired by Fortis from Warrior Trading constitutes trade secrets under the federal Defend Trade Secrets Act, 18 U.S.C. § 1836, et seq. (the "Act"), and thereby is entitled to protection under the Act.

113.   After his termination for cause and the forfeiture of his shareholder rights pursuant to the Shareholder Agreement, Fortis access and acquired this information without authorization, in breach of his duties to Warrior Trading, his Employment Agreement, and the Shareholder Agreement.

114.   Based upon his prior status as an officer, employee, and shareholder of Warrior Trading, Fortis knew that he acquired this trade secret information by improper means and without Warrior Trading's consent and in violation of his duties to maintain the secrecy of the trade secret information and limit its use under the law and pursuant to his agreements.

115.   Fortis has acquired by improper means and will inevitably use, disclose, rely upon and otherwise disseminate Warrior Trading's confidential and proprietary information for his benefit and to the detriment of Warrior Trading. Upon information and belief, he has already done so.

116.   This conduct constitutes an unauthorized use of Warrior Trading's confidential and proprietary information and trade secrets in violation of the Act and causes Warrior Trading to suffer both measurable and immeasurable business injuries which cannot be sufficiently compensated for by money damages.

117.   Warrior Trading has no adequate remedy at law and will suffer substantial and immediate irreparable harm unless Fortis is enjoined as requested below.

118.   In addition, to the extent Warrior Trading's damages can be determined, Warrior Trading is entitled to an award of compensatory and

exemplary damages due to Fortis's willful and malicious misappropriation and attorneys' fees.

WHEREFORE, Warrior Trading prays for judgment against Fortis as follows:

1. A declaration of the parties' rights and obligations as provided herein above;

2. An award in an amount in excess of $50,000 as proved during the arbitration;

3. An award of punitive and exemplary damages;

4. An award of attorneys' fees and costs;

5. An award of pre-judgment interest;

6. A preliminary and permanent injunction enjoining Fortis's acquisition, use, and threatened use of any of Warrior Trading's trade secrets information; and

7. Such other relief the Arbitrator(s) may deem just and proper.


LEIGH GODDARD NV Bar #6315
LAURA JACOBSEN, NV Bar #13699 /
CA Bar #280543
McDONALD CARANO LLP
100 W. Liberty Street, Tenth Floor
Reno, Nevada 89505
Telephone: (775) 788-2000
Facsimile: (775) 788-2020
lgoddard@mcdonaldcarano.com
ljacobsen@mcdonaldcarano.com

DATED:  January 2, 2019

CONNOLLY GALLAGHER LLP

TIMOTHY M. HOLLY (DE Bar #4106)
RYAN P. NEWELL (DE Bar #4744)
1000 West Street, Ste. 1400
Wilmington, DE 19801
Telephone: (302) 757-7300
Facsimile: (302) 757-7299
tholly@connollygallagher.com
rnewell@connollygallagher.com

*Attorneys for Plaintiff*

# EXHIBIT 1

# EXHIBIT 1

## NEWFANE DESIGN, INC.

### Shareholder Agreement

This Agreement ("Agreement") is made on _8/18/2016_ at _Newfane, VT_, by and among NEWFANE DESIGN, INC., a Vermont corporation (the "*Company*"), and the undersigned holders of shares of common stock (collectively, the "*Shareholders*"), with respect to all shares of the Company's capital stock now or hereafter outstanding, for the purpose of protecting the Company and the Shareholders, as well as providing continuity for the Company's business in the event of the occurrence of certain events discussed in this Agreement. Collectively, the Shareholders together own all outstanding shares of the Company's stock.

      1.     Share Certificate Legend Requirement. Until a termination of this Agreement pursuant to the provisions herein, at which time, at the expense of the Company, a new certificate shall be issued to holders of shares represented by certificates removing the following legend, the certificates representing shares of capital stock of the Company (whether presently owned or subsequently issued) held at any time by the Shareholders or their respective authorized transferees subject to this Agreement shall bear the following legend:

> "The shares of stock represented by this certificate, including their sale, transfer, hypothecation, encumbrance, or disposition, are restricted by the provisions of a Shareholder Agreement dated _8/18/16_ (as may be amended from time to time). All provisions of the Shareholder Agreement are incorporated by reference in this certificate. A copy of the Agreement may be inspected at the principal office of the Company."

A copy of this Agreement shall be delivered to the Secretary of the Company, and shall be shown to anyone inquiring about it.

      2.     Election of Directors. Pursuant to the Articles of Incorporation (the "*Articles*") and Bylaws of the Company the number of directors to comprise the Company's Board of Directors (the "*Board*") has been fixed at three (3). Each Shareholder hereby agrees that from and after execution of this Agreement and until the termination of this Agreement, such Shareholder will vote all shares of the capital stock of the Company which are voting shares and any other voting securities of the Company over which such Shareholder has voting control or are owned by such Shareholder, beneficially or of record, on the record date fixed for a determination of those Shareholders entitled to vote in any election of directors of the Company, or will cause such shares to be voted and shall take all other necessary or desirable actions within such Shareholder's control (including in his or her capacity as a shareholder, director, member of a board committee or officer of the Company or otherwise, and including, without limitation, attendance at meetings in person or by proxy for purposes of obtaining a quorum and execution of written consents in lieu of meetings), and the Company shall

take all necessary or desirable actions within its control (including, without limitation, calling special Board and Shareholder meetings), so that:

      a.    The authorized number of directors on the Board be established and remain at three (3) directors;

      b.    There shall be elected to the Board (i) two persons nominated by ROSS CAMERON; and (ii) one person nominated by JEFF FORTIS.

    3.    <u>Action by Directors</u>. Any representative of any Shareholder or who shall serve as a member of the Board shall have full authority to exercise his discretion and business judgment to perform his duty as a director and shall incur no special obligation or liability to any party hereto as a result of such exercise.

    4.    <u>Irrevocable Proxy</u>. The Shareholders shall, concurrently with the execution of this Agreement, deliver to the Company an irrevocable proxy in the form attached hereto as Exhibit "A" entitling the Company's chief executive officer to vote the Shareholders' shares in the event that such Shareholder refuses or is unable to vote his or its shares in the manner required by this Section 2 above.

    5.    <u>Restrictions on Voluntary Transfers</u>. Except as provided for in Paragraph 7 below, no Shareholder shall sell, transfer, pledge, encumber, hypothecate, or in any way dispose of any of his or her shares or any right or interest in them without obtaining prior written consent of the Company and of all other Shareholders (other than as provided for in Paragraph 7 below), unless (a) the proposed transfer is made in Good Faith (as such term is defined below), (b) the consideration for the transfer is cash *only*, (c) the Shareholder shall first have given written notice ("Offer Notice") to the Company, in accordance with Paragraph 14(e) of this Agreement, of his or her intention to do so, and (d) confirmation acceptable to the Company that the proposed transfer will not affect the tax status of the Company. A transfer shall be deemed to not be in Good Faith where the proposed transferee is any party that (i) is, or has ever been, in direct or indirect competition or negotiation with Company, (ii) is a supplier, vendor, service provider, or service recipient of Company, (iii) has a record of felony conviction, or (iv) would reasonably be determined to adversely affect the Company's business or reputation were such party to be a co-owner of Company. The notice shall be accompanied by an executed counterpart of any document of transfer, which must include the name and address of the proposed transferee and specify the number of shares to be transferred, the price per share, the term of payment, and evidence of availability of funds in accordance with the consideration offer terms (e.g., current bank statement, certificate of deposit, or the like). Promptly on receipt of the notice, the Secretary of the Company shall forward a copy of the notice and the executed counterpart to each member of the Company's Board, and within 20 days thereafter a meeting of the board of directors shall be duly called, noticed, and held to consider the proposed transfer.

    Should the proposed transfer violate provision 5(a), 5(b), 5(c) and/or 5(d) above, the proposed transfer shall be deemed null and void by its terms ("Void

Proposal"), the secretary of the Company shall give written notice of that fact to the offering Shareholder, and no further consideration or action shall be required by the board. As to any proposal other than a Void Proposal, for 45 days following notice to the Company, the Company shall have the option, but not the obligation, to purchase all or any part of the shares at the price and on the terms stated in the notice and any accompanying transfer document(s), or at a price determined in the same manner as provided in Paragraph 10(a) of this Agreement, whichever price is lower. The Company's right to exercise the option and to purchase the stock is subject to any applicable governmental or statutory restrictions that are now, or may become, effective.

If the Company exercises the option within the 45-day period, the secretary of the Company shall give written notice of that fact to the offering Shareholder. The Company shall pay the purchase price in the manner provided in the Agreement/terms of sale to the proposed transferee or as may be set forth in the transfer document(s) accompanying the notice.

If the option is not exercised by the Company on all shares set forth in the notice of intention to transfer within the 45-day period, notice of the proposed transfer in the same form as the notice given to the Company shall be given by the offering Shareholder in accordance with Paragraph 14(e) to the remaining Shareholders (such notice to be given immediately after the expiration of the Company's 45-day period, and in any event no later than within 14 days of such expiration), who shall have the option, but not the obligation, to purchase any shares not purchased by the Company at the price and on the same terms and conditions specified in the notice and any accompanying transfer documents. Within 20 days after receiving the notice, any Shareholder desiring to acquire any part or all of the shares offered shall deliver to the secretary of the Company a written election to purchase the shares or a specified number of them. If the total number of shares specified in the elections exceeds the number of available shares, each Shareholder shall have priority, up to the number of shares specified in his or her notice of election to purchase the available shares, in the same proportion that the number of the Company's shares that he or she holds, bears to the total number of the Company's shares held by all Shareholders electing to purchase. The shares not purchased on such a priority basis shall be allocated in one or more successive allocations to those Shareholders electing to purchase more than the number of shares to which they have priority right, up to the number of shares specified in their respective notices, in the proportion that the number of shares held by each of them bears to the number of shared held by all of them.

Within 30 days after the mailing of the notice to the Shareholders, the secretary of the Company shall notify each Shareholder of the number of shares as to which his or her election was effective, and the Shareholder shall meet the terms and conditions of the purchase within 10 days thereafter.

If the Company and the remaining Shareholders do not purchase all the shares set forth in the notice of intention to transfer, all the shares may be transferred to the proposed transferee on the terms specified in the notice, at any time within 30 days after expiration of the Shareholders' Options. The transferee will hold the shares subject

to the provisions of this Agreement. No transfer of the shares shall be made after the end of the 30-day period, nor shall any change in the terms of transfer be permitted without a new notice of intention to transfer and compliance with the requirements of this paragraph.

Any transfer by any shareholder in violation of this paragraph, including but not limited to the timelines set forth herein, shall be null and void and of no effect.

6.      Pledge, Hypothecation or Other Encumbrances. No Shareholder may pledge, hypothecate, or otherwise encumber his or her shares as security for any debt.

7.      Permitted Transfers. Notwithstanding anything in this Agreement to the contrary, any Shareholder may transfer shares subject to this Agreement only if the transfer will not affect the tax status of the Company and only as follows: (a) to a trust for the sole benefit of the transferee, provided that the transferee is the settlor and a trustee of the trust; or (b) to a corporation or other legal entity in which transferee retains 100% voting control. Any permitted transferee(s) shall hold the shares subject to all provisions of this Agreement, as provided in Paragraph 8.

8.      Obligation of Transferees. Unless this Agreement expressly provides otherwise, each transferee or any subsequent transferee of shares in the Company (including any transferee under Paragraph 5 or Paragraph 7, above), or any interest in such shares, shall hold the shares or interest in the shares subject to all provisions of this Agreement (as may be amended) and shall make no further transfers except as provided in this Agreement (as may be amended). Transfer of the shares shall not be entered on the books of the Company until the prospective transferee has executed an amended copy of this Agreement (with such amendments being made to maintain and preserve the intent of this Agreement and of its provisions), and the appropriate supporting documents are provided as follows:

a. In the case of a transfer to a trust for the sole benefit of transferee under Paragraph 7(a), a full copy of the executed trust instrument, for review and retention by the Company.

b. In the case of a transfer to a corporation or other legal entity under Paragraph 7(b), the appropriate legal records showing formation of the entity, governmental filings (including securities filing, where required), organizational minutes, stock transfer ledger (share register), shareholder agreement, buy/sell agreement, identity of all owners (including their address and phone numbers), capitalization table (current, *and* on a fully-diluted basis), and any other document that may be reasonably required by the Board under the specific circumstances at hand.

In all cases, no transfer shall take place until and unless (i) all supporting documents have been delivered to Company; (ii) such supporting documents comply with the requirements above and are not inconsistent with them in any way; (iii) at least 30

calendar days have passed since all supporting documents listed or requested have been provided to the Company; and (iv) the amended copy of this Agreement (as discussed above) has been signed and provided to the Company. Failure or refusal to sign such an amended copy of this Agreement shall not relieve any transferee from any obligations under this Agreement.

9.     Purchase Events

         a.    Purchase on Violation of Terms: A Shareholder's violation of any material provision contained in this Agreement that remains uncured for a period of at least thirty (30) days from the date a Shareholder or the Company gives written notice of such breach ("Notice of Breach") to the breaching Shareholder in accordance with Paragraph 14(e) (unless the nature of the breach is such that it cannot be cured within said 30-day period, then the breaching Shareholder shall have such additional time as may be reasonably necessary to cure the breach, provided that the curing of such breach is begun promptly and is pursued with diligence) shall trigger an optional buy-back of such breaching Shareholder's stock. At the conclusion of the 30-day period following the Notice of Breach, the Company shall give written notice to the breaching Shareholder of the buy-back option ("Notice of Buy-Back") in accordance with Paragraph 14(e). Such notice shall deem the breaching Shareholder to have offered to sell his or her shares at the price and on the terms provided in this Agreement. The Company and the other Shareholders shall have the option for 90 days following the Notice of Buy-Back to purchase all or any part of the shares owned by the breaching Shareholder, irrespective of whether or not a correction of the breach has taken place since the Notice of Buy-Back was given. The option shall be exercisable first by the Company and thereafter by the remaining Shareholders, as follows:

         The Company shall have the option, for a period commencing with the date of the Notice of Buy-Back and ending on the 45th day thereafter, to purchase all or any part of the shares owned by the breaching Shareholder, at the price and on the terms provided in this Agreement. The option shall be exercised by giving notice to the breaching Shareholder in accordance with Paragraph 14(e). If the option is not exercised within that 45 day period for all of the shares owned by the breaching Shareholder, the remaining Shareholders shall have the option, for 45 days commencing with the end of the Company's 45 day period to purchase all or any part of the shares owned by the breaching Shareholder, at the price and on the terms provided in this Agreement. The option shall be exercised by giving notice, in accordance with Paragraph 14(e), to the breaching Shareholder, stating the number of shares being purchased. If notices of exercise from the remaining Shareholders specify in the aggregate more shares than are available for purchase by the Shareholders, each Shareholder shall have priority, up to the number of shares specified in his or her notice, to purchase the available shares in the same proportion that the number of the Company's shares he or she holds bears to the number of the Company's shares held by all Shareholders electing to purchase. The shares not purchased on such a priority basis shall be allocated in one or more successive allocations to those Shareholders electing to purchase more than the number of shares to which they have a priority right, up to the number of shares specified in their respective

notices, in the proportion that the number of shares held by each of them bears to the number of shares held by all of them. In the event this option is not exercised as to all the shares owned by the breaching Shareholder, the breaching Shareholder or breaching Shareholder's successor in interest will continue holding such remaining shares subject to the provisions of this Agreement.

b. <u>Purchase on Criminal Conviction or Certain Misconduct</u>. A Shareholder who is (i) convicted of a felony or (ii) engages in willful misconduct (which shall mean the knowing and intentional failure to exercise ordinary care to prevent material injury to the Company or an intentional act with knowledge that it is likely to result in material injury to the Company), fraudulent activities, conflicts of interest, personal dishonesty, breach of fiduciary duty to the Company or Shareholders, sexual harassment, or willful violation of the law (other than a violation of a traffic law or similar minor offense), where any such behavior in any manner adversely affects the Company's business or reputation, shall trigger an optional buy-back of such Shareholder's stock. In the event any Shareholder has been convicted of a felony or has engaged in a manner prohibited by this paragraph, such Shareholder, his personal representative, or any other Shareholder shall give written notice to the Company and all Shareholders in accordance with Paragraph 14(e) ("Notice of Buy-Back"). By such notice, the offending Shareholder shall be deemed to have offered to sell his or her shares at the price and on the terms provided in this Agreement. The Company and the other Shareholders shall have the option for 90 days following notice of any such event(s) to purchase all or any part of the shares owned by the Shareholder. The option shall be exercisable first by the Company and thereafter by the remaining Shareholders in the manner provided by Paragraph 9(a) above. In the event this option is not exercised for all the shares owned by the offending Shareholder, the offending Shareholder or the offending Shareholder's successor in interest will continue holding such remaining shares subject to this Agreement.

c. <u>Purchase on Certain Other Events</u>. In the event any Shareholder is adjudicated a bankrupt, whether voluntarily or involuntarily, or makes an assignment for the benefit of creditors, or files a petition seeking to force the involuntary winding up and dissolution of the Company, or if substantially all property of any Shareholder is levied on and sold in a judicial proceeding, the Company and the other Shareholders shall have the option for 90 days following notice of any such event(s) to purchase all or any part of the shares owned by the Shareholder. Any Shareholder who has information that would reasonably cause the Shareholder to believe that his or her shares would be transferred involuntarily or by operation of law, or upon the happening of any of the above described events, shall give written notice to the Company and the other Shareholders in accordance with Paragraph 14(e) ("Notice of Buy-Back"), and shall offer or shall be deemed to have offered to sell his or her shares at the price and on the terms provide in this Agreement (If no notice is given by the Shareholder, the Company or any other Shareholder may give such notice in lieu thereof, and such notice will then constitute the "Notice of Buy-Back"). The option shall be exercisable first by the Company and thereafter by the remaining Shareholders in the manner provided by Paragraph 9(a) above. In the event this option is not exercised as to all the shares owned

by the Shareholder, the Shareholder or Shareholder's successor in interest will continue holding such remaining shares subject to this Agreement.

d. <u>Purchase on Death</u>. The Company shall have the option, for a period commencing with the death of any Shareholder and ending 90 days after the death, to purchase all or any part of the shares owned by the decedent, at the price and on the terms provided in this Agreement. The option shall be exercised by giving notice to the decedent's estate or other successor in interest in accordance with Paragraph 14(e). If the option is not exercised within that 90-day period as to all shares owned by the decedent, the surviving Shareholders shall have the option, for 30 days commencing with the end of that 90-day period to purchase all or any part of the shares owned by the decedent, at the price and on the terms provided in this Agreement. The option shall be exercised by giving notice, in accordance with Paragraph 14(e), to the executor or administrator, stating the number of shares to which it is exercised. If notices of exercise from the surviving Shareholders specify in the aggregate more shares than are available for purchase by the Shareholders, each Shareholder shall have priority, up to the number of shares specified in his or her notice, to purchase the available shares in the same proportion that the number of the Company's shares he or she holds bears to the number of the Company's shares held by all Shareholders electing to purchase. The shares not purchased on such a priority basis shall be allocated in one or more successive allocations to those Shareholders electing to purchase more than the number of shares to which they have a priority right, up to the number of shares specified in their respective notices, in the proportion that the number of shares held by each of them bears to the number of shares held by all of them. In the event this option is not exercised as to all the shares owned by the decedent, the decedent's estate will hold those shares, and such shares shall inure to the benefit of heirs, subject to the provisions of this Agreement.

e. <u>Purchase on Termination of Employment</u>. In the event any employee Shareholder is no longer employed by the Company because of voluntary termination, or termination by the Company for Cause (the term "Cause" as defined in the then applicable employment agreement between Company and the relevant employee Shareholder, except that irrespective of such definition, it shall not include physical and/or mental disability), the Company and the remaining Shareholders shall have the option for 90 days following notice of any such event(s) to purchase all or any part of the shares owned by the terminated employee Shareholder. Notice of the triggering event shall be given to the Company and the other Shareholders in accordance with Paragraph 14(e) ("Notice of Buy-Back"). The option shall be exercisable first by the Company and thereafter by the remaining Shareholders in the manner provided by Paragraph 9(a) above. In the event this option is not exercised as to all the shares owned by the terminated employee Shareholder, the terminated employee Shareholder or the terminated employee Shareholder's successor in interest will continue holding such remaining shares subject to this Agreement.

Notwithstanding anything to the contrary in this Agreement or applicable laws, and to the fullest extent permissible under the law, an employee Shareholder whose

7

employment terminates because of termination by the Company for cause at any time, shall forfeit any and all shareholder rights immediately upon termination of employment.

f. <u>Purchase on Total Disability</u>. If any Shareholder (whether or not an employee Shareholder) becomes physically or mentally incapacitated (as defined below) for more than one-hundred-twenty (120) days during any rolling 365 day period (whether or not consecutive) ("Incapacity" or "Incapacitated") (such initial 120 day period defined herein as "Period of Initial Incapacity"), and which Incapacity is likely in the opinion of a physician ("Designated Physician") mutually designated by the incapacitated Shareholder, or his personal representative or agent, and the Company, to persist for an additional ninety (90) days or more beyond the Period of Initial Incapacity (such determination made no earlier than the end of the Period of Initial Incapacity), the Company and the remaining Shareholders shall have the option for 90 days following the physician determination ("Buy Back Period") to purchase all or any part of the shares owned by the incapacitated Shareholder. Notice shall be given to the Company and the other Shareholders in accordance with paragraph 14(e) ("Notice of Buy-Back"). The option shall be exercisable first by the Company and thereafter by the remaining Shareholders in the manner provided by Paragraph 9(a) above. In the event this option is not exercised as to all the shares owned by the incapacitated Shareholder, the incapacitated Shareholder or the incapacitated Shareholder's successor in interest will continue holding such remaining shares subject to this Agreement.

A Shareholder shall be deemed Incapacitated where (a) the person is unable to provide properly for that person's own needs for physical health, food, clothing, or shelter; to manage substantially that person's own financial resources; or to resist fraud or undue influence; and/or (b) either a medical doctor, board-certified neuropsychologist, or a board-certified psychiatrist, not related by blood or marriage to any Company shareholder, officer, or director, examines such person and declares under penalty of perjury that such person is either temporarily or permanently incapacitated, according to generally accepted medical definitions.

If during the Buy Back Period, but prior to a Notice of Buy-Back being given, the Designated Physician determines that the Shareholder is no longer Incapacitated, and in the case of an employee Shareholder such Shareholder in fact fully resumes his or her regular duties in Company, then the Buy Back Period shall be terminated (subject to any future incapacity, which shall trigger this clause anew).

g. <u>Multiple Triggers</u>. Should a trigger for optional purchase by the Company and/or Shareholders arise while another trigger has already arisen as to the same Shareholder (e.g., a Shareholder-employee is terminated for cause two weeks after the Shareholder's felony conviction), the Company and/or Shareholders may purchase under either trigger. The first Notice of Buy-Back communicated in accordance with Paragraph 14(e) shall control, *except* that a subsequent Notice of Buy-Back shall control where (i) it is communicated after the first Notice of Buy-Back, and (ii) specifically confirms the intent of it controlling and replacing the first notice due to an additional trigger. In any event, no Notice of Buy-Back shall be valid unless it is

communicated in a timely fashion based on such relevant timelines (if any) as may be stated in this Agreement and as may be applicable to the relevant trigger.

h. Community Property Interest. In all cases where purchase of shares is authorized in this Agreement, if the shares are in whole or in part a community property asset, then the community property interest of the surviving spouse is also subject to purchase.

## 10. Purchase Related Provisions

Valuation. The purchase price per share to be paid for shares subject to this Agreement shall be determined by dividing the net income of the Company for the Company's prior fiscal year by the number of outstanding shares issues to Shareholders. In determining the net income for purposes of valuation, the income of any shareholders shall be normalized to the average income for such shareholders over the prior three fiscal years. This method shall apply to all valuation including but not limited to any "fair value" determinations under applicable law.

a. Payment and Transfer of Shares. On the occurrence of any event that leads to the purchase of shares under this Agreement, the consideration to be paid for the shares shall be paid to the transferring Shareholder or to his or her estate, as the case may be. If the event that leads to the purchase is the death of a Shareholder, the Company or the surviving Shareholders shall file the necessary proofs of death and collect the proceeds of any outstanding insurance policies on the life of the deceased Shareholder as covered by this Agreement (if any). The decedent's personal representative shall apply for and obtain any necessary court approval or confirmation of the sale of the decedent's shares under this Agreement. In all events, consideration for the shares shall be delivered as soon as practicable to the person entitled to it, and the Secretary of the Company shall cause the certificates representing the purchased shares to be properly endorsed and, on compliance with any and all provisions in this Agreement (including paragraph 10(e)), shall issue new certificate(s) in the name of the purchaser or purchasers. If the purchase price exceeds the amount of insurance proceeds, the purchaser or purchasers shall pay the purchase price in cash up to the full amount of the insurance proceeds and shall pay the balance of the purchase price in cash or under a promissory note. If the insurance proceeds exceed the purchase price, the excess shall be paid to the insured or the beneficiary of the policy.

In the event that a selling Shareholder shall fail to produce or deliver the stock certificate or certificates representing the share of stock involved, duly endorsed for transfer, then the purchase price (consisting of cash and/or a promissory note) for the shares of stock may be tendered and delivered by the purchaser to the secretary of the Company for the account and benefit of the selling Shareholder, and the selling Shareholder shall be notified in writing of that action by the purchaser. Such tender and delivery shall constitute valid payment for the shares of stock, and the purchase of the shares shall be deemed thereby to have been fully effected, so that all right, title, and interest in and to the shares of stock so purchased shall be considered vested in the

9

purchaser, and all rights of the selling Shareholder, or any transferee, assignee, or any other person having any interest in those shares of stock, shall cease and terminate except only for the right, if any, to receive the purchase price for the stock and the right to have the stock deposited to secure the payment of the purchase price. The secretary, as attorney-in-fact for and in the name of the selling Shareholder, shall cause the shares of stock so purchased to be transferred on the books of the Company to the purchaser. The purchase price, as determined and paid in accordance with these terms, shall be payable to the selling Shareholder only on delivery of a stock certificate for the shares of stock to be purchased, duly endorsed for transfer, together with the payment of all costs and expenses of the Company incurred in connection with the transaction. In the event that a selling Shareholder shall fail to deliver a stock certificate for the shares of stock to be purchased, duly endorsed for transfer, together with the payment of all costs and expenses of the Company incurred in connection with the transaction, and therefore fails to collect the purchase price that had been tendered to the secretary of the Company for 180 days from the date the selling Shareholder received notice of such tender, whether due to unavailability or for any other reason, and should the purchaser be the Company, the secretary of the Company may void any tendered check, and keep the debt on its book by book entry only until such time, if any, that selling Shareholder complies with the requirements herein.

Each Shareholder does hereby irrevocably appoint and designate the secretary of the Company, and his or her respective successor in office, as the Shareholder's attorney-in-fact on the Shareholder's behalf, and on behalf of the Shareholder's estate and personal representative, to effect the transfer of the shares of stock on the books of the Company in the manner provided above.

b. <u>Notes and Security</u>. To the extent otherwise permissible by the terms of this Agreement, any deferred portion of the purchase price for any shares purchased under this Agreement shall be represented by a promissory note executed by all the purchasing Shareholders, providing for joint and several liability. Each maker agrees to pay his or her pro-rata portion of each installment of principal and interest as it falls due. The note shall provide for payment of principal in ten equal quarterly installments with interest on the unpaid balance at the then applicable average commercial lending rate available at commercial banks, with full privilege of prepayment of all or any part of the principal at any time without penalty or bonus. Any prepaid sums shall be applied against the installments thereafter falling due in inverse order of their maturity, or against all the remaining installments equally, at the option of the payers. The note shall provide that if default occurs, at the election of the holder the entire sum of principal and interest will immediately be due and payable and that the makers shall pay reasonable attorney fees to the holder if suit is commenced because of default. The note shall be secured by a pledge of all the shares being purchased in the transaction to which the note relates and of all other shares owned by the purchasing Shareholders. The parties shall agree upon the pledgeholder, and the pledge agreement shall contain such other terms and provisions as may be customary and reasonable. As long as no default occurs in payments on the note, the purchasers shall be entitled to vote the shares; however, dividends shall be paid to the holder of the note as a prepayment of principal. The

purchasers shall expressly waive demand, notice of default, and notice of sale, and they shall consent to public or private sale of the shares in a default, in mass or in lots at the option of the pledgeholder, and the seller shall have the right to purchase at the sale.

                    c. <u>Administrative Approvals</u>. The Company agrees to apply for, and use its best efforts to obtain, all governmental and administrative approvals required in connection with the purchase and sale of shares under this Agreement. The Shareholders agree to cooperate in obtaining the approvals and to execute any and all documents that they may be required to execute in connection with the approvals. The Company shall pay all costs and filing fees in connection with obtaining the approvals.

                    11. <u>Termination</u>. This Agreement shall terminate on the earlier of (a) the written agreement of the Company and all Shareholders, (b) the dissolution, bankruptcy, or insolvency of the Company, (c) at such time as only one Shareholder remains, (d) the effective date of the first registration statement filed under the Securities Act of 1933 (as amended, the "*Securities Act*"), with the Securities and Exchange Commission relative to the Company's equity securities, with aggregate net proceeds to the Company of more than $1,000,000 at a pre-offering valuation of more than $5,000,000 (a "*QIPO*") or (e) upon the occurrence of the merger or consolidation of the Company into, or the sale of all or substantially all of the Company's assets to another corporation, unless the shareholders of the Company shall own at least 51% of the capital stock of such other corporation immediately after such merger, consolidation or sale (a "*M&A*").

                    12. <u>Shareholder Will</u>. Each Shareholder agrees to include in his or her will a direction and authorization to his or her executor to comply with the provisions of this Agreement and to sell his or her shares in accordance with this Agreement. However, the failure of any Shareholder to do so shall not affect the validity or enforceability of this Agreement.

                    13. <u>Drag-Along Obligation</u>. Until the date of a QIPO, if one or more Shareholders intend to make a Control Transfer (as defined below) for consideration to any person or entity or group of related persons or entities, wherein such one or more Shareholders collectively own directly or beneficially at least 70% of the outstanding capital stock of the Company on a fully-diluted basis, then upon notice to each non-transferring Shareholder, the transferring Shareholder(s) (for purposes of this Section 13, the "*Dragging Shareholder*") may cause each non-transferring Shareholder to sell the shares of the Company owned by it as provided in this Section 13. The Dragging Shareholder will notify each non-transferring Shareholder in writing (the "*Drag-Along Notice*") of such intended transfer and the exercise of its rights hereunder at least thirty (30) days prior to the proposed date for the consummation of such transfer, which notice will contain all of the material terms of the transfer, including, without limitation, the name and address of the prospective purchaser(s), the type and number of shares of the Company's stock to be sold, the purchase price and other terms and conditions of payment (or the basis for determining the purchase price and other terms and conditions). The non-transferring Shareholders will be required to sell all of the shares of Common

Stock of the Company owned by such non-transferring Shareholders. *"Control Transfer"* means a sale, exchange or other transfer by one or more Shareholders pursuant to a private sale or other transaction or series of transactions (other than pursuant to a registered public offering) of an aggregate of more than ninety percent (90%) of the outstanding shares of the Company to any person or entity. Any transfer pursuant to this Section 13 will be on the same terms and conditions, and for the same consideration per share, as the transfer by the Dragging Shareholder that is the subject matter of the Drag-Along Notice. Notwithstanding the foregoing, no Shareholder may exercise its drag-along rights under this Section 13 in a transaction with an affiliate of such Shareholder unless the purchase price for each share of the Company's stock is equal to that which could be obtained in an arms' length transaction.

### 14. Miscellaneous Matters.

a. Agreement to Perform Necessary Acts. Each party to this Agreement agrees to perform any further acts and execute and deliver any documents that may be reasonably necessary to carry out the provisions of this Agreement.

b. Amendments. The provisions of this Agreement may be waived, altered, amended, or repealed, in whole or in part, only on the written consent of all parties to this Agreement.

c. Successors and Assigns. This Agreement shall be binding on and enforceable by and against the parties to it and their respective heirs, legal representatives, successors, and assigns.

d. Validity. All provisions of this Agreement are separate and divisible, and if any part is held invalid, the remaining provisions shall continue in full force and effect.

e. Notices. All notices, request, demands, and other communications under this Agreement shall be in writing and shall be deemed to have been duly given on the date of service if served personally on the party to whom notice is to be given, or within 72 hours after mailing, if mailed to the party to whom notice is to be given, by first-class mail, registered or certified, postage prepaid, properly addressed to the party at the address set forth on the signature page of this Agreement, or any other address that a party may designate by written notice to the others, with proof of receipt obtained.

f. Attorneys' Fees. If any party to this Agreement shall bring any action, suit, counterclaim or appeal for any relief against the other (including arbitration), declaratory or otherwise, to enforce the terms hereof or to declare rights hereunder (collectively, an "Action"), it is the express intent of the parties that **neither party**, regardless of who is deemed prevailing, shall be entitled to recover as part of any such Action its attorneys' fees and costs, including any fees and costs incurred in bringing

and prosecuting such Action and/or enforcing any order, judgment, ruling or award granted as part of such Action.

g. <u>Governing Law, Jurisdiction, and Venue</u>. The laws of the State of Vermont shall govern the terms of this Agreement without reference to the choice of law principles thereof. Any controversy or claim arising out of or relating to this Agreement, or breach thereof, shall be settled by binding arbitration to be held in Vermont or such other agreed to location. Judgment upon the award rendered by the arbitrators may be entered in any court having jurisdiction thereof. The parties, in accordance with Arbitrator rules, shall select arbitrators with qualifications and expertise within the field of dispute. Each party shall have the ability in their sole discretion to veto the selection of one (1) arbitrator, in which case Arbitrator shall offer alternative selection. Each party shall have the right of discovery as set forth in the Federal Rules of Civil Procedure. Arbitrator shall administer the arbitration. The administrative fees associated with these proceedings shall be shared equally by the parties. No attorney fees or costs shall be recoverable, as provided for above.

h. <u>Counterparts</u>. This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

i. <u>Entire Agreement</u>. This Agreement constitutes the entire agreement between the parties hereto with respect to the subject matter hereof.

15. <u>Additional Terms</u>. As material consideration and inducement to enter this Agreement, the parties adopt all terms on the attached Exhibit "B" with the explicit intent that such terms shall govern their actions as shareholders and otherwise.

[Signature Page Follows]

13

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first shown above.

**COMPANY**

NEWFANE DESIGN, INC.

By: _____
Name: ROSS CAMERON
Title: _____ President

By: _____
Name: JEFF FORTIS
Title: _____ Secretary

**SHAREHOLDERS**

ROSS CAMERON

By: _____
Name: ROSS CAMERON
Residence Address: _47 Bray St. Newfane VT 05345_

JEFF FORTIS

By: _____
Name: JEFF FORTIS (Jeffrey Fortis Family Trust)
Residence Address: _____

ALEX FORTIS

By: _____
Name: ALEX FORTIS (Alex Fortis Family Trust)
Residence Address: _____

14

## SPOUSAL CONSENT TO SHAREHOLDER AGREEMENT

I am the spouse of _Ross Cameron_, a shareholder of NEWFANE DESIGN, INC. I acknowledge that I have read the Shareholder Agreement ("Agreement") dated _____ by and between my spouse (amongst others) and NEWFANE DESIGN, INC., a Vermont corporation ("Company"), and that I clearly understand its provisions. I am aware that by the provisions of the Agreement, my spouse has agreed to sell or transfer all his or her interest in the Company, including any community property interest, in accordance with the terms and provisions of the Agreement. I hereby expressly approve of, and agree to be bound by, the provisions of the Agreement in its entirety, including but not limited to, those provisions relating to the sales and transfers of the interest in the Company. If I predecease my spouse when my spouse owns an interest in the Company, I hereby agree not to devise or bequeath whatever community property interest I may have in the Company (if any) in contravention of this Agreement.

Date: _8/9/2016_
Signature of Spouse: _Lauren Turchirl (Cameron)_
Print Name: _Lauren Turchine (Cameron)_

16

## Exhibit A

## IRREVOCABLE PROXY COUPLED WITH AN INTEREST

### RECITALS

A.     Pursuant to the terms of that certain Shareholder Agreement, dated as of _8/18/2016_ (the "*Agreement*"), the undersigned desires to execute this "*Irrevocable Proxy*": (i) so that in the event that the undersigned refuses or is unable to vote his or her shares as required under Section 2 of the Agreement, the person holding the title of Chief Executive Officer of NEWFANE DESIGN, INC. (the "*Company*"), from time to time (the "*CEO*"), can exercise all voting and consent rights associated with the shares of the Company's stock held by the undersigned to vote such shares as required by Section 2 of the Agreement; and (ii) to appoint the CEO as irrevocable proxyholder pursuant to the terms set forth herein.

### IRREVOCABLE PROXY

1.     The undersigned hereby revokes all previous proxies and appoints the CEO as proxyholder to vote the undersigned's shares as required by Section 2 of the Agreement on or after the date of giving this Irrevocable Proxy and prior to the termination of this Irrevocable Proxy, with the same effect as if the undersigned had personally voted his or her shares.

2.     The undersigned authorizes and directs the proxyholder to file this Irrevocable Proxy appointment with the secretary of the Company.

3.     This Irrevocable Proxy is coupled with an interest and is irrevocable (to the fullest extent permitted by law); provided however that the CEO shall not be entitled to exercise his or her authority under this Irrevocable Proxy unless and until the undersigned refuses or is unable to vote his or her shares as required under Section 2 of the Agreement.

4.     This Irrevocable Proxy is given pursuant to Vermont law to secure the undersigned's performance of its obligations under the Agreement and will remain irrevocable until such time as the undersigned is no longer bound by the terms of the Agreement.

5.     If this Irrevocable Proxy is held invalid or unenforceable, the intent of the parties shall govern.

This Proxy may not be assigned or otherwise transferred, and any purported assignment in violation of this provision shall be void. Notwithstanding the foregoing, any obligation of the undersigned hereunder shall be binding upon the successors and assigns of the undersigned.

Dated:     _8/18/2016_

17

Print Name: _Ross Camoun_

Number and Description of Shares: _____ (_____) Shares of Common Stock

Allocation of
Shares.

    {  1001   Ross
       462    Jeff
        77    Alex

       1540  shares

18